IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2026 Term

FILED

May 1, 2026

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 23-760

Statoil USA Onshore Properties Inc.,
Petitioner below/Petitioner,

v.

Matthew R. Irby, State Tax Commissioner,
Respondent below/Respondent.

Appeal from the Intermediate Court of Appeals
No. 22-ICA-225
(West Virginia Office of Tax Appeals Docket No. 20-111)

REVERSED AND REMANDED WITH DIRECTIONS

Submitted:   March 3, 2026
Filed:  May 1, 2026

AND

No. 24-26

Matthew R. Irby, State Tax Commissioner
Respondent below/Petitioner,

v.

Equinor USA Onshore Properties Inc.,
Petitioner below/Respondent.

Appeals from the Intermediate Court of Appeals
Nos. 22-ICA-111, -225, and -226
(West Virginia Office of Tax Appeals Docket Nos.
19-008, 19-064, 20-111, 20-222, and 22-023)

AFFIRMED AND REMANDED WITH DIRECTIONS

Submitted:  March 3, 2026
Filed: May 1, 2026

Alexander Macia, Esq.
Paul G. Papadopoulos, Esq.
Chelsea E. Thompson, Esq.
Spilman Thomas & Battle PLLC
Charleston, West Virginia
Counsel for Equinor USA Onshore
Properties Inc., formerly known as
Statoil USA Onshore Properties Inc.

John B. McCuskey, Esq.
Attorney General
Michael R. Williams, Esq.
Solicitor General
Seth E. Harper, Esq.
Cassandra L. Means-Moore, Esq.
Assistant Attorneys General
Charleston, West Virginia
Counsel for Matthew R. Irby, State Tax
Commissioner

JUSTICE EWING delivered the Opinion of the Court.

JUSTICE TITUS, deeming himself disqualified, did not participate in the decision of these appeals.

JUDGE CARL, sitting by temporary assignment.

**SYLLABUS BY THE COURT**

1.     "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syllabus Point 1, *Appalachian Power Co. v. State Tax Department of West Virginia*, 195 W. Va. 573, 466 S.E.2d 424 (1995).

2.     "'The judiciary is the final authority on issues of statutory construction, and we are obliged to reject administrative constructions that are contrary to the clear language of a statute.' Syl. Pt. 5, *CNG Transmission Corp. v. Craig*, 211 W. Va. 170, 564 S.E.2d 167 (2002)." Syllabus Point 2, *St. Joseph's Hospital of Buckhannon, Inc. v. Stonewall Jackson Memorial Hospital Co.*, 252 W. Va. 526, 923 S.E.2d 456 (2025).

3.     "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."  Syllabus Point 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959).

4.     "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature."  Syllabus Point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W. Va. 108, 219 S.E.2d 361 (1975).

5.     "'In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meanings.' Syl. pt. 1, *Tug Valley Recovery Center v. Mingo County Commission*, 164 W. Va. 94, 261 S.E.2d 165

i

(1979)." Syllabus Point 1, *Thomas v. Firestone Tire & Rubber Co.*, 164 W. Va. 763, 266

S.E.2d 905 (1980).

**EWING, Justice**:

Equinor USA Onshore Properties Inc. (Equinor)[1] is a natural gas producer. It pays severance taxes to the State of West Virginia of five percent of the "gross value" of the natural gas it produces in West Virginia, annually, as shown by the "gross proceeds" derived by Equinor from the sale of that gas. Equinor filed amended severance tax returns for tax years 2014, 2015, 2016, 2018, and 2019, seeking sizable refunds based on its recalculation of the gross value of the natural gas it produced in West Virginia during those tax years. Matthew R. Irby, West Virginia Tax Commissioner, decreased Equinor's requested refunds because he determined that Equinor had impermissibly deducted its actual transportation, transmission, and processing costs from the gross proceeds it derived from the sale of the natural gas *and* claimed a fifteen percent safe harbor deduction for transportation and transmission costs. Equinor appealed to the Office of Tax Appeals (OTA), which affirmed the Tax Commissioner's decision. Equinor then appealed to the Intermediate Court of Appeals (ICA), which reversed the OTA. *See Statoil USA Onshore Props., Inc. v. Irby*, 249 W. Va. 424, 433, 895 S.E.2d 827, 836 (Ct. App. 2023).

On appeal to this Court, the Tax Commissioner argues that the ICA misjudged the gross proceeds Equinor derived from the sale of its natural gas for the tax years at issue, and so erroneously allowed Equinor to deduct its transportation, transmission, and other costs and claim the fifteen percent safe harbor deduction.

---

[1] Equinor was formerly known as Statoil USA Onshore Properties Inc.

Considering the language of the relevant statutes and regulations, we disagree with the Tax Commissioner and affirm those rulings of the ICA at issue in appeal no. 24-26.

A separate appeal, no. 23-760, relates to the timeliness of Equinor's appeal to the OTA of the Tax Commissioner's decrease of its requested refund for tax year 2015. The OTA decided that the Tax Commissioner was estopped from challenging the timeliness of the petition, and the ICA reversed that decision. Equinor now appeals. Following a de novo review of the relevant statutes, particularly West Virginia Code § 11-10A-9(b) (2005), and consideration of the particular facts underlying Equinor's appeal, we conclude that Equinor's April 2020 petition to the OTA for reassessment of its tax year 2015 severance tax refund was timely, and so we reverse the ICA's decision to the contrary.

The Court orders the Clerk to enter an order consolidating appeal nos. 23-760 and 24-26 for decision contemporaneous with this Opinion.

## I. FACTUAL & PROCEDURAL BACKGROUND

We present the factual and procedural background of these appeals separately. First, we detail the factual and procedural background of appeal no. 24-26, relating to Equinor's entitlement to severance tax refunds for tax years 2014, 2015, 2016, 2018, and 2019. Then, we review the background of appeal no. 23-760, relating to the timeliness of Equinor's appeal to the OTA for review of the Tax Commissioner's decision to decrease the severance tax refund requested by Equinor for tax year 2015.

2

**A. Appeal No. 24-26 (Tax Years 2014, 2015, 2016, 2018, and 2019)**

Equinor produces "raw gas" from wells located in West Virginia. Raw gas is a combination of water, sand, natural gas liquids, and dry gas. Equinor uses its own equipment to bring the raw gas to "pipeline specifications," then transports the raw gas to a third-party processing plant. MarkWest Liberty Midstream & Resources LLC (MarkWest) processed Equinor's raw gas during the relevant tax years pursuant to a series of contracts (Equinor-MarkWest contracts). Under those contracts, MarkWest took title to the "raw make" contained within Equinor's raw gas at the "Receipt Point" to its processing plant, or "Plant Inlet," then processed the raw gas into raw make and "residue gas."

MarkWest next sent the raw make to its fractionation plant, where MarkWest fractionated the raw make into natural gas liquids (NGLs). The NGLs traveled to the "Delivery Point," which is the "Outlet Flange" of MarkWest's fractionation plant. There, the Equinor-MarkWest contracts afforded Equinor two options. First, Equinor could take the NGLs in kind—something that it did not do during the tax years at issue here. Second, if Equinor did not take the NGLs in kind, the Equinor-MarkWest contracts obligated Equinor to sell the NGLs to MarkWest, MarkWest to buy them, and then MarkWest to sell the NGLs to third parties using "commercially reasonable efforts . . . ." Under either option, Equinor paid "fees and expenses . . . to MarkWest in connection with the receipt and exchange of [Equinor's] Raw Make for [NGLs] delivered at the Delivery Point . . . ." Those fees and expenses included a "Fractionation Fee," pipeline fees, a marketing fee, and a loading fee.

3

Having sold the NGLs to third parties using commercially reasonable efforts, the Equinor-MarkWest contracts then obligated MarkWest to pay Equinor on a per month basis equal to the sales price of the NGLs, multiplied by the volume of each type of NGL, "less all applicable fees and charges . . . ." MarkWest issued to Equinor a monthly "Percent of Proceeds Statement" (or in the parties' terms, a "settlement statement") in which MarkWest listed several values, including the "Product Value," that is, the value of the NGLs "MarkWest sold to a third party;"[2] MarkWest's fees and charges; and the "Net Value" payable to Equinor, which is the "product value minus the fees and adjustments." Ultimately, "the [N]et [V]alue [is] what was actually received by Equinor as the producer," although in at least one instance the fees and charges listed on the settlement statement exceeded the Product Value, and Equinor paid the difference to MarkWest. In every other instance during the tax years at issue, though, the Product Value was a higher figure than the Net Value, meaning that MarkWest paid Equinor the Net Value listed on the settlement statements.

When Equinor first filed its returns for tax years 2014, 2015, 2016, 2018, and 2019, Equinor identified the Product Value figures in the settlement statements as the gross proceeds from its sales. In 2018, Equinor filed amended severance tax returns seeking refunds totaling more than $19,000,000 for those tax years. In the amended returns,

---

[2] Mr. Tomas Gaytan, Equinor's tax consultant, testified to this before the OTA during an October 2021 evidentiary hearing. Mr. Gaytan also testified that "MarkWest sells it. They get that value, right? MarkWest is the one that gets on the settlement statement the product value number."

4

Equinor identified the settlement statement Net Value as the gross proceeds of its sales. The Tax Commissioner granted Equinor roughly $13 million in refunds for tax years 2014, 2015, 2016, 2018, and 2019, but denied the remainder. For example, the Tax Commissioner determined that Equinor was owed a refund of approximately $3.6 million for tax year 2014, rather than the $4.9 million refund for which it filed, based on his determination that Equinor was not entitled to deduct "marketing and administrative fees on the actual transportation allowance"—that is, the marketing and other administrative fees listed on the relevant settlement statements—and deduct "the 15% safe harbor because [Equinor was] claiming actual transportation expenses." The Tax Commissioner repeated this rationale in letters sent to Equinor decreasing its requested refund for tax years 2015, 2016, 2018, and 2019.[3]

Equinor petitioned the OTA for reassessments, resulting in five cases: case no. 19-008 (tax year 2014), case no. 20-111 (tax year 2015), case no. 19-064 (tax year 2016), case no. 20-222 (tax year 2018), and case no. 22-023 (tax year 2019). Considering the petitions involved similar legal issues, "[t]he parties agreed to be bound, for all years at issue in these appeals, by a test case involving tax years 2014 and 2016 . . . ." *Statoil USA Onshore*, 249 W. Va. at 427 n.4, 895 S.E.2d at 830 n.4. The OTA held a consolidated evidentiary hearing for those cases in April 2021, at which an Equinor employee; Mr.

---

[3] The Tax Commissioner decreased Equinor's requested refund for tax years 2018 and 2019 for additional reasons.

5

Tomas Gaytan, Equinor's tax consultant; and Stacy Acree, Director of the State's Tax Account Administration Division, testified.

In August 2022, the OTA issued a final decision in which it affirmed the Commissioner's decrease letters regarding tax years 2014 and 2016 (case nos. 19-008 and 19-064). The OTA concluded that the gross proceeds of Equinor's sales were the settlement statement Product Value, not the Net Value, so that the Tax Commissioner correctly decreased Equinor's requested refunds for those tax years. Then, on October 7, 2022, the OTA entered a final order in case no. 20-111 (tax year 2015) and a single, final order in case nos. 20-222 (tax year 2018) and 20-023 (tax year 2019). In those orders, the OTA affirmed the Commissioner's decrease letters for tax years 2015, 2018, and 2019 for the reasons detailed in the August 2022 order entered in case nos. 19-008 and 19-064.

Equinor then filed three appeals with the ICA. In 22-ICA-111, Equinor appealed the OTA's order in case nos. 19-008 and 19-064, relating to tax years 2014 and 2016. In 22-ICA-225, Equinor appealed the OTA's order in case no. 20-111, relating to tax year 2015. And in 22-ICA-226, Equinor appealed the OTA's order in case nos. 20-222 and 20-023, relating to tax years 2018 and 2019. The Commissioner cross-assigned error in 22-ICA-225 regarding the OTA's denial of the Commissioner's motion to dismiss Equinor's petition for reassessment for tax year 2015 on jurisdictional grounds. The ICA later consolidated 22-ICA-111, 22-ICA-225, and 22-ICA-226.

6

On November 15, 2023, the ICA filed an opinion in the consolidated appeals. In 22-ICA-111 and 22-ICA-226, the ICA reversed the OTA's decisions regarding Equinor's severance tax refunds for tax years 2014, 2015, 2016, 2018, and 2019. The ICA reasoned that "the Tax Commissioner and OTA failed to adhere to the applicable statutes and legislative rule when determining the taxable gross value of the NGLs at the wellhead in the context of Equinor's refund claims," and that "the correct figure to determine the value of the NGLs at the wellhead for severance tax purposes is the gross amount Equinor receives from MarkWest, not the product value shown on the settlement statements . . . ." *Statoil USA Onshore Props., Inc.*, 249 W. Va. at 430, 895 S.E.2d at 833. Consequently, the ICA went on to hold that "Equinor had not already deducted its actual costs incurred prior to the point of sale," so that "Equinor was entitled to assert the safe harbor deduction" of fifteen percent," and the OTA erred when it affirmed the Tax Commissioner's determination that Equinor could not claim the fifteen percent, safe harbor deduction. *Id*. at 431, 895 S.E.2d at 834. The Tax Commissioner now appeals to this Court.

**B.     Appeal No. 23-760 (Tax Year 2015)**

Equinor paid the State approximately $6.7 million in severance tax for tax year 2015. In 2018, however, Equinor filed an amended return for tax year 2015 seeking a refund of nearly $5 million. On January 23, 2019, the Tax Commissioner issued a decrease letter to Equinor in which he informed Equinor that a portion of the requested refund of approximately $2.6 million had been approved.

7

A short time later, Mr. Gaytan emailed an audit clerk in the Tax Division stating that, by his calculations, Equinor was owed a refund of $3.3 million—not the $2.6 million approved in the decrease letter dated January 23, 2019. On February 13, 2019, Ms. Acree responded to Mr. Gaytan that Equinor had not calculated two schedules similarly, and that the Tax Commissioner was "pulling the refund back to further review what is going on with Schedule C."

On February 27, 2019, the Tax Commissioner issued a second decrease letter to Equinor related to tax year 2015. The Tax Commissioner informed Equinor that a refund of roughly $3.2 million was approved and was being processed. On February 28, 2019, Mr. Gaytan, Ms. Acree, and the audit clerk had a phone call. During the call, Mr. Gaytan asserted that the $3.2 million figure included in the February 27 decrease letter was short by approximately $23,000. Mr. Gaytan testified before the OTA during an October 2020 hearing that "[t]he main purpose of the call was to get to the correct number to appeal because everybody on the call was under the understanding that we were going to petition the full denied amount." Mr. Gaytan also testified that those on the call understood that they "were all trying to get to the final number to get a new letter reissued to appeal. But there was no question in anyone's mind that we [Equinor ] were not going to appeal the denied amount." Ms. Acree later testified that she did not recall whether a third decrease letter had been promised to Equinor during the February 28 call. Ms. Acree did recall, however, that "[a]t the end of the discussion," she "asked the [a]udit [c]lerk just to go and check it. I said go look at it and you know, see if, you know, there is an error or there's

8

something that we – you know, to see why she denied the additional $23,000." On March 3, 2019, the Tax Department issued a refund check to Equinor of approximately $3.2 million, which did not contain the $23,000 discussed by Mr. Gaytan and Ms. Acree during the February 28 phone call.

The audit clerk tasked with reviewing the alleged $23,000 miscalculation became ill and passed away in the fall of 2019. In January 2020, Ms. Acree learned that the audit clerk did not complete the review discussed in February 2019, so she reviewed the calculation for tax year 2015 herself. Ms. Acree concluded that Equinor was, in fact, owed an additional $23,000 refund for tax year 2015. On February 27, 2020, Ms. Acree emailed another Tax Department employee and instructed her to "set up the [$23,000] on the Severance Tax" to Equinor. She copied Mr. Gaytan on that email. A check for the additional refund was issued to Equinor on February 27, 2020.

On April 7, 2020, Equinor filed a petition for reassessment for tax year 2015 with the Office of Tax Appeals. The Tax Commissioner moved to dismiss Equinor's petition, arguing that Equinor filed it after the sixty-day filing deadline had passed. Equinor responded that Ms. Acree told it in February 2019 that the tax year 2015 refund was under review, and that she would send Equinor a third decrease letter, so that it did not petition for reassessment until after it learned of the additional, $23,000 refund in February 2020 and realized that a third decrease letter was not forthcoming. Equinor also argued that the Commissioner should be estopped from asserting that Equinor's petition was late, due to Ms. Acree's assurance that the Tax Commissioner would issue a third denial letter.

9

On January 8, 2021, the OTA entered a decision granting the Commissioner's motion to dismiss Equinor's petition for reassessment for tax year 2015 as untimely filed. The OTA ruled that Equinor had met the traditional elements necessary to equitably estop a non-governmental party but had not made the heightened showing necessary to estop the government. Equinor appealed to the Circuit Court of Kanawha County. The court reversed the OTA, reasoning that estoppel may run against the government for public policy reasons. On remand, the OTA applied the circuit court's rationale and concluded that public policy mandated estopping the Commissioner from asserting that Equinor's petition for reassessment was untimely filed. The OTA entered an order denying the Commissioner's motion to dismiss Equinor's petition in May 2022.

As detailed above, the OTA entered a final order related to tax year 2015 on October 7, 2022. Equinor appealed that order to the ICA, resulting in 22-ICA-225. The Tax Commissioner cross-assigned error to the OTA's denial of his motion to dismiss Equinor's petition for reassessment. The ICA reversed the OTA, concluding that (1) the deadline to file an appeal with the OTA is jurisdictional, and (2) Equinor could not "avail itself of equitable estoppel to expand [the] OTA's jurisdiction to consider objections to the Tax Commissioner's determinations concerning tax year 2015," and so "reversed the circuit court's finding to the contrary." *Statoil USA Onshore Props., Inc.*, 249 W. Va. at 432–33, 895 S.E.2d at 835–36. Equinor now appeals the ICA's reversal of the OTA's order denying the Tax Commissioner's motion to dismiss Equinor's petition for reassessment related to tax year 2015 as untimely.

10

## II. STANDARD OF REVIEW

The parties ask this Court to examine various statutes relating to oil and gas severance taxes. "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995). While the Tax Commissioner intimates that we are bound to give his "interpretation and application of tax laws" deference, "'[t]he judiciary is the final authority on issues of statutory construction, and we are obliged to reject administrative constructions that are contrary to the clear language of a statute.' Syl. Pt. 5, *CNG Transmission Corp. v. Craig*, 211 W. Va. 170, 564 S.E.2d 167 (2002)." Syl. Pt. 2, *St. Joseph's Hosp. of Buckhannon, Inc. v. Stonewall Jackson Mem'l Hosp. Co.*, 252 W. Va. 526, 923 S.E.2d 456 (2025).

Analysis of a statute must begin with the language of the statute itself. *See Bullman v. D & R Lumber Co.*, 195 W. Va. 129, 135 n.9, 464 S.E.2d 771, 777 n.9 (1995) ("It has been emphasized repeatedly that the starting point in every case involving construction of a statute is the language itself.") (alteration and internal quotation omitted). "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute." Syl. Pt. 5, *State v. General Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959); *see also* Syl. Pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted

11

by the courts but will be given full force and effect."). However, "[a] statute that is ambiguous must be construed before it can be applied." Syl. Pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992). "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. Pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975).

Finally, these appeals arise from contested cases subject to the State Administrative Procedures Act, West Virginia Code §§ 29A-5-1 to -5. Therefore, we apply the following, familiar standard:

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedures;
>
> (4) Affected by other error of law;
>
> (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W. Va. Code § 29A-5-4(g); *see, e.g.*, *St. Joseph's Hosp. of Buckhannon, Inc.*, 252 W. Va. at ___, 923 S.E.2d at 461 (applying § 29A-5-4(g) to review ICA opinion affirming a decision of the West Virginia Health Care Authority); *cf. Nesselroad v. State Consol. Pub.*

*Ret. Bd.*, 225 W. Va. 397, 399, 693 S.E.2d 471, 473 (2010) (stating that this Court's "review of the circuit court's ruling on a matter subject to the Administrative Procedures Act is governed by the same statutory standards of review employed by the trial court").

### III. DISCUSSION

These consolidated appeals present two primary questions. First, appeal no. 24-26 presents the question of how to determine the gross proceeds from the sale of the natural gas severed in West Virginia by Equinor during the pertinent tax years. Second, appeal no. 23-760 presents the question of whether Equinor's petition to the OTA for review of the Tax Commissioner's decision regarding tax year 2015 was timely, and, if not, whether the Tax Commissioner was estopped in some fashion from challenging the timeliness of that filing. We first consider appeal no. 24-26, then address appeal no. 23-760.

### A.     Appeal No. 24-26

The Tax Commissioner appeals the ICA's November 2023 opinion related to tax years 2014, 2015, 2016, 2018, and 2019, in which it reversed the OTA's decisions affirming the refund-decrease letters issued by the Tax Commissioner to Equinor relevant to those years. The Tax Commissioner assigns several errors to the ICA's decision; we address those assigned errors after reviewing the statutes and regulations pertaining to taxes on the severance and production of natural gas in this State.

13

## 1. Severance Taxes

Equinor must pay severance taxes to the State of West Virginia "[f]or the privilege of engaging or continuing within this state in the business of severing natural gas or oil for sale, profit or commercial use" at a rate of "five percent of the gross value of the natural gas" it produces. W. Va. Code § 11-13A-3a(a), (b) (2006).[4] "'Gross value' in the case of natural resources means the market value of the natural resource product, in the immediate vicinity where severed, determined after application of post production processing generally applied by the industry to obtain commercially marketable or usable natural resource products." *Id*. § 11-13A-2(c)(6) (2004). "For natural gas, gross value is the value of the natural gas at the wellhead immediately preceding transportation and transmission." *Id*. § 11-13A-2(c)(6)(G).

The "gross proceeds derived from the sale [of natural gas] by the producer" demonstrates the "gross value" of the natural gas. *Id*. § 11-13A-3a(b) ("The tax imposed in subsection (a) of this section shall be five percent of the gross value of the natural gas or oil produced as shown by the gross proceeds derived from the sale thereof by the producer . . . ."). In turn, "'[g]ross proceeds' means the value, whether in money or other property, actually proceeding from the sale or lease of tangible personal property, or from the rendering of services, without any deduction for the cost of property sold or leased or

---

[4] The Legislature amended West Virginia Code §§ 11-13A-3a in 2020, see 2020 W. Va. Acts 886, and 11-13A-2 in 2021. See 2021 W. Va. Acts 2342. Those amendments do not affect our analysis.

14

expenses of any kind." *Id*. § 11-13A-2(b)(5). A "'[s]ale' includes any transfer of the ownership or title to property, whether for money or in exchange for other property or services, or any combination thereof." *Id*. § 11-13A-2(b)(10).

The Legislature referred to the "processing" of natural gas in multiple sections of Article 13a, Chapter 11 of the Code. Relevant here, the Legislature specified in § 11-13A-2(c)(11) that while "'[s]evering' . . . means the physical removal of the natural resources from the earth or waters of this state by any means," in the context of natural gas, "'severing' . . . shall not include any separation process of . . . natural gas commonly employed to obtain marketable natural resource products." *Id*. § 11-13A-2(c)(11) ; *see also* W. Va. Code R.§ 110-13A-4.3 (1992) ("Treatment Processes Considered Part of Production of Oil, Natural Gas and Natural Gas Liquids. -- The privileges of severing and producing oil and natural gas shall not include any conversion or refining process. Oil and natural gas will be valued at the well-mouth in conformance with Subsection 4.8."). Similarly, § 11-13A-4(c) (1985) excludes from "[t]he privileges of severing and producing oil and natural gas . . . any conversion or refining process." Finally, in § 11-13A-2(c)(9)(A), the Legislature declared that "'[p]rocessed' or 'processing' as applied to . . . [o]il and natural gas shall not include any conversion or refining process . . . ."

Due to the deregulation of the natural gas market, "oil and gas are no longer sold 'at the wellhead,' but rather are sold downstream of the wellhead, typically at the interstate pipeline." *Leggett v. EQT Prod. Co.*, 239 W. Va. 264, 271, 800 S.E.2d 850, 857 (2017), *superseded by statute*, 2018 W. Va. Acts 690, *as recognized in*, *SWN Prod. Co.,*

15

*LLC v. Kellam*, 247 W. Va. 78, 85, 875 S.E.2d 216, 223 (2022). To account for the migration of sales downstream, "[i]n order to arrive at the well-mouth value of such severance and production, transportation or transmission expenses incurred by producers of natural gas before its sale shall be allowed as a deduction from the gross proceeds of the sale of such gas." W. Va. Code R. § 110-13A-4.8. The legislative rules set out four methods to do that; two are relevant here. Under West Virginia Code of State Rules § 110-13A-4.8.1, the producer can deduct "[f]rom the gross proceeds of the sale of the production of natural gas . . . the amount of the costs of transportation or transmission of such gas through the system of the producer from the well-mouth point of severance and production to the point of sale." Rather than itemize the deductions, the producer can elect to take a fifteen percent deduction of the gross proceeds of the natural gas it severs and produces in a particular tax year. W. Va. R. Code § 110-13A-4.8.4 (allowing that "the well-mouth value of such severance and production of natural gas not sold at the well-mouth may be determined by a deduction of transportation and transmission costs in the amount of 15% of the gross proceeds of the natural gas severed and produced").

## 2. Gross Proceeds

The Tax Commissioner assigns numerous errors to the ICA's November 2023 decision reversing the OTA's decision affirming the decrease letters issued by the Tax Commissioner to Equinor. He first argues that the settlement statement Product Value represents the gross proceeds of the sale of Equinor's natural gas, and is, therefore, the appropriate starting point of the computation of Equinor's severance tax obligation.

16

Equinor responds that the Product Value is not the appropriate starting point because, in actuality, it receives only the settlement statement Net Value from the sale of its natural gas, and that the "processing" services provided by MarkWest are not the taxable act of "severing."

In view of the plain language of the statutes reviewed above, we concur with Equinor that the settlement statement Net Value, and not the Product Value, best represents the "gross proceeds," *see* W. Va. Code § 11-13A-2(b)(5), of the sale of Equinor's natural gas.[5] First, a "sale" for purposes of determining a producer's gross proceeds, "includes any transfer of the ownership or title to property, whether for money or in exchange for other property or services, or any combination thereof." *Id*. § 11-13A-2(b)(10). Here, Equinor transferred title to the raw make contained within its raw gas to MarkWest at the Receipt Point, a point preceding MarkWest's processing and fractionation plants. Second,

[5] As stated above, the pertinent statutes and regulations are clear, and neither party argues otherwise. Thus, this Court is not called upon to identify or construe the governing law. Rather, we are left to apply that governing law to determine which of the two contractual terms (Product Value or Net Value) advocated by the parties best approximates the statutory, "gross proceeds" of Equinor's sale of raw make to MarkWest in view of the parties' particular arguments. *Compare State ex rel. W. Va. Div. of Corr. & Rehab. v. Ferguson*, 248 W. Va. 471, 478 n.7, 889 S.E.2d 44, 51 n.7 (2023) ("'When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'") (quoting *State v. Blake*, 197 W. Va. 700, 706, n.10, 478 S.E.2d 550, 556 n.10 (1996)) *with Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (observing, "as a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief'") (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)).

17

"gross proceeds derived from the sale [of natural gas] by the producer," demonstrates the gross value of a producer's natural gas. Under West Virginia Code § 11-13A-2(b)(5), "'[g]ross proceeds' means the value, whether in money or other property, actually proceeding from the sale or lease of tangible personal property, or from the rendering of services, without any deduction for the cost of property sold or leased or expenses of any kind." *Id*. § 11-13A-2(b)(5). Returning to the Equinor-MarkWest contracts, we see that the Product Value is the value actually proceeding from the sale of the NGLs by MarkWest to third parties; it represents what MarkWest immediately derives from those sales— regardless of what MarkWest may pay to Equinor, later. As Mr. Gaytan testified, "MarkWest is the one that gets on the settlement statement the product value number." Equinor is not a party to those sales, nor does it derive the settlement statement Product Value from them. Rather, the only sale to which Equinor is a party is a sale to MarkWest, and the only value actually proceeding from that sale, and which is derived by Equinor, is the settlement statement Net Value. Thus, the settlement statement Net Value best approximates the gross proceeds of Equinor's sale of the raw make contained in its natural gas to MarkWest.

Additionally, the settlement statement Product Value is realized *after* processing and separation of the raw make supplied to MarkWest by Equinor. While "gross value" may be determined, generally, "after application of post production processing generally applied by the industry to obtain commercially marketable or usable natural resource products," *id*. § 11-13A-2(c)(6), "'processing' as applied to . . . [o]il and

18

natural gas shall not include any conversion or refining process . . . ." *Id*. § 11-13A-2(c)(9)(A). Therefore, the "gross value" of Equinor's raw make may not be determined after conversion or refining processes—a circumstance that aligns with the Legislature's instruction that, "[f]or natural gas, gross value is the value of the natural gas at the wellhead immediately preceding transportation and transmission." *Id*. § 11-13A-2(c)(6)(G). Moreover, while "'[s]evering' . . . means the physical removal of the natural resources from the earth or waters of this state by any means," in the context of natural gas, "'severing' . . . shall not include any separation process of . . . natural gas commonly employed to obtain marketable natural resource products." *Id*. § 11-13A-2(c)(11); *see also id*. § 11-13A-4(c) ("Treatment processes considered part of production of oil, natural gas and natural gas liquids.--The privileges of severing and producing oil and natural gas shall not include any conversion or refining process.").[6] The Tax Commissioner provides no explanation as to why those statutes would not apply to the processing and fractionation performed by MarkWest to exclude them from the privilege subject to taxation under § 11-13A-3a(a) ("For the privilege of engaging or continuing within this state in the business of severing natural gas or oil for sale, profit or commercial use, there is hereby levied and shall be

---

[6] *See also* W. Va. Code R.§ 110-13A-4.3 ("Treatment Processes Considered Part of Production of Oil, Natural Gas and Natural Gas Liquids. -- The privileges of severing and producing oil and natural gas shall not include any conversion or refining process. Oil and natural gas will be valued at the well-mouth in conformance with Subsection 4.8.").

19

collected from every person exercising such privilege an annual privilege tax . . . .").[7] Thus, we disagree with the Tax Commissioner that the settlement statement Product Value is the appropriate "starting point" to calculate Equinor's severance tax liability because that value is realized *after* MarkWest processes, fractionates, and sells the raw make supplied by Equinor to third parties. *Cf. id*. § 11-13A-2(c)(6) ("'Gross value' in the case of natural resources means the market value of the natural resource product, *in the immediate vicinity where severed*, determined after application of post production processing generally applied by the industry to obtain commercially marketable or usable natural resource products.") (emphasis added).

For this same reason, the numerous natural-gas-royalty cases[8] cited by the Tax Commissioner do not persuade us that the value of MarkWest's processing and fractionation services is consideration paid by MarkWest to Equinor for the sale of its gas.

---

[7] The Tax Commissioner cites the first portion of § 11-13A-2(c)(11) in his brief but does not cite the statute's final proviso. *Id*. (providing that "'severing' or 'severed' oil and natural gas shall not include any separation process of oil or natural gas commonly employed to obtain marketable natural resource products."). The Tax Commissioner does not address the statute in his reply brief.

[8] *See, e.g.*, *BlueStone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 391 (Tex. 2021) (contract "require[ed] royalties to be calculated on 'gross *value received*,' which refer[red] to all consideration received"). The Tax Commissioner cites *United Fuel Gas Co. v. Battle* for the proposition that "this Court relied on royalty cases to determine what qualified as 'consideration' and 'taxable production of gas'" under the business and occupation tax system that preceded the severance tax system. *See United Fuel Gas Co. v. Battle*, 153 W. Va. 222, 231, 167 S.E.2d 890, 897 (1969). Be that as it may, we decided *United Fuel Gas Co.* under "severance's predecessor tax," to use the Tax Commissioner's words. The statutes discussed above resolve the particular question presented in this appeal, and we focus our analysis accordingly.

20

Were that the case, then the value of those services would be included in the "gross proceeds" which the Tax Commissioner asserts Equinor derives from the sale of its natural gas. That cannot be true though, given that (1) the value actually proceeding from the sale is the gross proceeds of the sale; (2) the gross proceeds derived by the producer from the sale demonstrate the gross value of natural gas that, itself, is the result of severing; and (3) "[t]he privileges of severing and producing oil and natural gas shall not include any conversion or refining process." W. Va. Code § 11-13A-4(c). The Tax Commissioner's insistence that the label applied to those services in the Equinor-MarkWest contracts ("Consideration") does not change the Legislative mandates of West Virginia Code §§ 11-13A-2(c)(11) and 11-13A-4(c).[9]

The Tax Commissioner replies that equating the settlement statement Product Value to the statutorily defined, gross proceeds of the sale of Equinor's natural gas is permissible because he allowed Equinor to deduct the processing-related fees listed on the settlement statements from that amount, citing *Kanawha Eagle Coal, LLC v. Tax Commissioner of the State of West Virginia*.[10] *Id.*, Syl. Pt. 3, 216 W. Va. 616, 609 S.E.2d

---

[9] We emphasize that "[o]nce the Legislature indicates its preference by the enactment of a statute, the Court's role is limited. Our duty is to interpret the statute, not to expand or enlarge upon it." *State ex rel. Riffle v. Ranson*, 195 W. Va. 121, 126, 464 S.E.2d 763, 768 (1995); *see also id.* at 129, 464 S.E.2d at 771 (citing *State v. Evans*, 170 W. Va. 3, 5, 287 S.E.2d 922, 924 (1982) ("[s]hould 'reason and experience' dictate a change in that statute, it is up to our legislature to draft and pass appropriate modifications")).

[10] Section 110-13A-4.8., 4.8.1, of the West Virginia Code of State Rules ("Transportation and Transmission Allowance for Natural Gas Producers") allows for a

21

877 (2004) ("Freight charges paid by a coal producer to a third party to transport fully processed clean coal from the coal preparation plant to the point at which title passes to the buyer are costs which are deductible from the gross proceeds of coal sales for purposes of assessing the severance tax imposed by West Virginia Code § 11–13A–3(a) (2002) (Repl.Vol.2003) under existing regulations promulgated by the West Virginia Department of Tax and Revenue."). However, *Kanawha Eagle* dealt with a coal producer's transportation costs. Moreover, those costs arose before the coal producer passed title of the coal to the buyer. Here, title to the raw make within Equinor's raw gas passed to MarkWest at the Plant Inlet. Additionally, if we accept the Tax Commissioner's position that the deduction of the processing-related fees from the settlement statement Product Value cures all in the circumstances before us, then we must also accept the Tax Commissioner's position that the settlement statement Product Value best represents the gross proceeds of Equinor's sale of natural gas to MarkWest.[11] As we have already

---

"deduction in the amount of the costs of transportation and transmission of such gas through the system of the producer from the well-mouth point of severance and production to the point of sale" "[i]n order to arrive at the well-mouth value of such severance and production."

[11] *Contrast Statoil USA Onshore Props., Inc.*, 249 W. Va. App. at 426, 895 S.E.2d at 829 ("net value" on settlement statement issued by NGL processor/seller to oil and gas producer "constitute[d] the amount Mark West pays to Equinor for purchase and sale of the raw gas converted into NGLs at the Plant Inlet," and was, therefore, the "gross proceeds" of the producer's sale of the NGLs, not the settlement statement "product value"), *with CNX Gas Co., LLC v. Irby*, No. 23-ICA-36, 2024 WL 1261813, at *3, *4 (W. Va. Ct. App. Mar. 25, 2024) (memorandum decision) (rejecting natural gas producer's argument that, "it [was] excused from paying severance tax on NGLs it chose not to sell at the wellhead," where natural gas producer sold NGLs after processing and fractionation

22

concluded, that is not the case considering the facts before us.[12]  For those reasons, we conclude that the OTA violated statutory provisions and erred as a matter of law when it concluded that the settlement statement Product Value best represented the gross proceeds of the sale of Equinor's natural gas for the tax years at issue in these appeals.

### 3.    Deductions for Transportation and Transmission

The Tax Commissioner also contends that the ICA erroneously reversed the decision of the OTA by giving "Equinor deductions the state and legislative rule don't allow."  In other words, the Tax Commissioner believes that the ICA incorrectly ruled that Equinor properly claimed the fifteen percent, safe harbor deduction from the settlement

---

and Tax Commissioner valued the producer's NGLs at the wellhead "through a cost deduction for transportation, pipeline transmission, and processing costs").

[12] Admittedly, the Equinor-MarkWest contracts require Equinor to pay MarkWest processing-related fees even if the NGLs sold by MarkWest to third parties returned zero value.  That situation arose only once in the relevant tax years.  Like the ICA, that singular occurrence does not persuade us that the settlement statement Product Value best represents the gross proceeds of the sale of MarkWest's natural gas.  As the ICA explained, such a position is

> inconsistent with the terms of the transaction between Equinor and MarkWest and market realities.  There is no dispute that title passed at the Plant Inlet and that NGLs were thereafter the sole property of MarkWest.  The settlement statements reflected a calculation of the gross amount Equinor was to receive.  Moreover, market prices for a commodity (especially prior to processing and delivery to an end-user) are dependent upon a number of market forces (supply, demand, futures markets, etc.) and are not dependent upon a producer's costs of production.

*Statoil USA Onshore Props., Inc.*, 249 W. Va. at 430 n.9, 895 S.E.2d at 833 n.9.

23

statement Net Value. Specifically, the Tax Commissioner argues that by using the settlement statement Net Value as the "starting point" of the calculation of Equinor's severance tax liability, the ICA impermissibly allowed Equinor to deduct its actual transportation and transmission costs and claim the fifteen percent, safe harbor deduction. Equinor counters that the pertinent regulation is clear that "[t]he fees on the settlement statements between MarkWest and Equinor do not qualify as Equinor's actual transportation and transmission costs . . . for myriad reasons . . . ."[13]

It bears repeating that "[f]or natural gas, gross value is the value of the natural gas at the wellhead immediately preceding transportation and transmission." *Id*. § 11-13A-2(c)(6)(g). As the majority of natural gas sales now occur away from the wellhead, "transportation or transmission expenses incurred by producers of natural gas before its sale shall be allowed as a deduction from the gross proceeds of the sale of such gas."

---

[13] We acknowledge the Tax Commissioner's argument that the ICA's decision erroneously permits Equinor to deduct nondeductible administrative and overhead expenses from the Commissioner's preferred "starting point" of the severance tax calculation, the settlement statement Gross Value. *See* W. Va. Code R. § 110-13A-4.8.1 (producer may not deduct from its gross proceeds "items unrelated to such transportation or transmission such as general administration, overhead, or return on investment."). We decline to reverse the ICA on this point. As stated previously, the settlement statement Net Value best approximates the value actually proceeding from *Equinor's* sales in contrast to the Product Value, that is, the value actually proceeding from the sale of the NGLs by *MarkWest*. Additionally, the administrative and overhead expenses arose after Equinor delivered the raw make to MarkWest at the Receipt Point of MarkWest's processing plant(s). We also recall the ICA's observation that "[t]his appeal reveals practical challenges in complying with and administering the severance tax on natural gas production. First, wellhead valuation is an inherently difficult task. Second, the governing contracts and settlement statements in this case were not drafted with severance tax in mind." *Statoil USA Onshore Props.*, 249 W. Va. at 430 n.10, 895 S.E.2d at 833 n.10.

24

W. Va. Code R. § 110-13A-4.8. Producers may elect to deduct "[f]rom the gross proceeds of the sale of the production of natural gas, . . . the amount of the costs of transportation or transmission of such gas through the system of the producer from the well-mouth point of severance and production to the point of sale." *Id*. § 110-13A-4.8.1. Alternatively, the producer may "deduct[] . . . transportation and transmission costs in the amount of 15% of the gross proceeds of the natural gas severed and produced." *Id*. § 110-13A-4.8.4.

In view of the plain language of this regulation, the OTA's decision was in error and the ICA correctly reversed. The transportation- and transmission-related fees listed on the settlement statement are tied to transportation and transmission through MarkWest's system, not Equinor's. *See* W. Va. Code R. § 110-13A-4.8.1 (allowing that "there shall be . . . a deduction in the amount of the costs of transportation or transmission of such gas through the system of the producer from the well-mouth point of severance and production to the point of sale"). The Tax Commissioner's assertion that MarkWest's systems were only open to Equinor if Equinor agreed to pay the transportation- and transmission-related fees cannot overcome the plain language of the regulation: a producer may deduct the cost of transportation and transmission through its system, that is, "the system of the producer." *Id*. The only transportation and/or transmission of the natural gas produced by Equinor, through Equinor's system, occurred between the wellhead and the Receipt Point of MarkWest's processing and fractionation plant. Therefore, those are the costs that Equinor may deduct from the gross proceeds of its sale (i.e., the settlement statement Net Value), and it may do so by one of the four options set forth in § 110-13A-

25

4.8 of the West Virginia Code of State Regulations.  Here, Equinor permissibly selected the fifteen percent, safe harbor deduction, *id*. § 110-13A-4.8.4.  For that reason, the OTA's decision to the contrary is affected by an error of law, and we, therefore, affirm the ICA's opinion in appeal no. 24-26.

**B.      Appeal No. 23-760**

Turning now to Equinor's appeal, no. 23-760, Equinor assigns ten errors to the ICA's decision reversing the OTA's denial of the Tax Commissioner's motion to dismiss Equinor's petition for reassessment for tax year 2015.  These assignments of error fall into two broad categories:  (1) the ICA erroneously presumed that Equinor received the "'final' notice of denial of [its] claim" in February 2019, when it was not until February 2020 that Equinor learned the final amount of its severance tax refund for tax year 2015, and (2) the ICA erroneously concluded that Equinor had not demonstrated the elements necessary to estop the Tax Commissioner from challenging the timeliness of Equinor's tax-year-2015 petition for reassessment.  The Tax Commissioner responds that Equinor's tax-year-2015 petition was indisputably late, the OTA does not have jurisdiction over such late-filed petitions, and the ICA correctly concluded that estoppel principles do not salvage Equinor's late-filed petition.  Having considered the parties' arguments and relevant authorities, we concur with Equinor that its April 2020 petition was timely filed and so reverse the corresponding part of the ICA's decision.

26

Equinor first argues that its April 2020 petition to the OTA was, in fact, timely because it filed the petition within sixty days of February 27, 2020—the date Ms. Acree emailed instructions to her colleague to refund the "$23,671.54 on the Severance Tax" to Equinor (copied to Mr. Gaytan) and the $23,671.54 refund check was issued to Equinor.[14]  According to Equinor, "[p]rior to that check being issued or email being sent, the amount of [its] refund remained undetermined," so the "operative and final 'notice of denial of taxpayer's claim' occurred with the February 27, 2020[,] refund check and email," not the February 27, 2019, letter.  Equinor also asserts that "[t]he fact notification was sent through this email and/or the receipt of a new refund check, and not a form denial letter, is not dispositive under the working of the statute."  Finally, Equinor argues that the ICA's decision "creates a conflict between the timeliness and content provisions of the underlying statute as to what is required for a petition for reassessment or refund." The Tax Commissioner responds that the February 27, 2019, letter "contained all the hallmarks of proper statutory notice;" Equinor's sixty-day deadline to challenge the denial contained within the February 27, 2019, letter was clear; and there is no conflict between the timeliness and content provisions of the statutes pertaining to petitions to the OTA for reassessment.

---

[14] The February 27, 2020, check does not appear in the record.  However, there is no dispute that such a check existed, the Tax Division issued the check to Equinor on February 27, 2020, and Equinor received the check.  The Tax Commissioner states in his response that, "[t]he Tax Division issued Equinor a $23,671.54 check on February 27, 2020, bringing the total refund it received for this year to $4,161,551.14, and the total amount denied to $675,996.87."

27

We begin with the relevant statutory language. *Bullman*, 195 W. Va. at 135 n.9, 464 S.E.2d at 777 n.9 ("It has been emphasized repeatedly that the starting point in every case involving construction of a statute is the language itself.") (alteration and internal quotation omitted). Under West Virginia Code § 11-10-14(d)(1) (2019) ("Overpayments; credits; refunds and limitations"), a taxpayer who is dissatisfied "with the Tax Commissioner's determination of taxpayer's claim for refund or credit . . . may file, with the Tax Commissioner, either personally or by certified mail, a petition for refund or credit . . . ." That statute then goes on to specify that, (1) "no petition for refund or credit may be filed more than 60 days after the taxpayer is served with notice of denial of taxpayer's claim," and (2) "after December 31, 2002, the taxpayer shall file the petition with the Office of Tax Appeals in accordance with § 11-10A-9 of this code." *Id.*

As the events at issue in this appeal occurred following December 31, 2002, our analysis proceeds to West Virginia Code § 11-10A-9. Sections (a) and (b) of West Virginia Code § 11-10A-9 provide that,

> (a) A proceeding before the Office of Tax Appeals appealing a tax assessment, a denial of a tax refund or credit or any other order of the Tax Commissioner, or requesting a hearing pursuant to the provisions of any article of this chapter which is administered pursuant to article ten of this chapter, shall be initiated by a person timely filing a written petition that succinctly states:
>
> (1) The nature of the case;
>
> (2) The facts on which the appeal is based; and
>
> (3) Each question presented for review by the Office of Tax Appeals.

28

(b) Except where a different time for filing a petition is specified elsewhere in this code, a petition filed pursuant to subsection (a) of this section is timely filed if postmarked or hand delivered to the Office of Tax Appeals within sixty days of the date a person received written notice of an assessment, denial of a refund or credit, order or other decision of the Tax Commissioner.

Taken together, subsection (a) and (b) provide that a person "initiate[s]" a proceeding before the Office of Tax Appeals by "timely filing a written petition" that contains certain information "within sixty days of the date a person received written notice of an assessment, denial or a refund or credit, order or other decision of the Tax Commissioner." *Id*. § 11-10A-9(a), (b).

Neither "written" nor "notice" is defined for purposes of § 11-10A-9; no party suggests those words are ambiguous. "'In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meanings.' Syl. pt. 1, *Tug Valley Recovery Center v. Mingo County Commission*, 164 W. Va. 94, 261 S.E.2d 165 (1979)." Syl. Pt. 1, *Thomas v. Firestone Tire & Rubber Co*., 164 W. Va. 763, 266 S.E.2d 905 (1980). "This Court has routinely looked to dictionary definitions to afford undefined terms their common, ordinary, and accepted meaning." *Eldercare of Jackson Cnty., LLC v. Lambert*, 250 W. Va. 291, 304 n.18, 902 S.E.2d 840, 853 n.18 (2024); *see, e.g.*, *Postlewait v. City of Wheeling*, 231 W. Va. 1, 4, 743 S.E.2d 309, 312 (2012) (citing the definition of "include" in *Black's Law Dictionary*); *State v. Soustek*, 233 W. Va. 422, 426, 758 S.E.2d 775, 779 (2014) (citing the definition of "financial" in *Merriam-Webster*). *Black's Law Dictionary* defines "notice" as "[l]egal notification

29

required by law or agreement, or imparted by operation of law as a result of some fact (such as the recording of an instrument); definite legal cognizance, actual or constructive, of an existing right or title . . . ." *Notice*, BLACK'S LAW DICTIONARY (12th ed. 2024). *Merriam-Webster* defines "notice" as a "warning or intimation of something," or "the condition of being warned or notified." *Notice*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/notice (last accessed March 30, 2026). The first definition of "written" in *Black's Law Dictionary* is "[e]xpressed in letters, words, etc., on paper or in some kind of medium." *Written*, BLACK'S LAW DICTIONARY (12th ed. 2024). And *Merriam-Webster* defines "written" as "made or done in writing." *Written*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/written (last accessed March 30, 2026).

We now apply § 11-10A-9 to the facts underlying Equinor's appeal. First, applying the common, ordinary and accepted meanings of "written" and "notice," the record shows that Equinor received four "written notice[s] of an assessment, denial of a refund or credit, order or other decision of the Tax Commissioner," W. Va. Code § 11-10A-9(b), relevant to its tax-year-2015 refund: the decrease letter on January 23, 2019; the decrease letter on February 27, 2019; the March 3, 2019 check; and the $23,000 refund check issued to Equinor on February 27, 2020.[15] We agree with the Tax Commissioner

---

[15] Having found the check issued to Equinor on February 27, 2020, sufficient "written notice" for purposes of § 11-10A-9, we decline to consider Ms. Acree's February 27, 2020, email.

that the first two writings are "formal denial letters," which have functioned as the "trigger for an appeal to OTA," in the Tax Commissioner's words. *See, e.g.*, *Helton v. Reed*, 219 W. Va. 557, 559, 638 S.E.2d 160, 162 (2006) ("Elk Run had sixty days from the receipt of the Tax Commissioner's letter to file a petition for refund with the newly-created [OTA], which acquired jurisdiction over such petitions on January 1, 2003").[16]  However, the Tax Commissioner did not point this Court to authority limiting the form of the "written notice of an assessment, denial or a refund or credit, order or other decision of the Tax Commissioner," W. Va. Code § 11-10A-9(b), to such "formal" letters.  Therefore, applying the plain language of § 11-10-9(b) to the specific facts of this case, we find that the $23,000 refund check issued to Equinor on February 27, 2020, was one of the four "written notice[s] of an assessment, denial or a refund or credit, order or other decision of the Tax Commissioner" issued to Equinor because (1) it was "written," and (2) it notified Equinor of the Tax Commissioner's final decision as to the amount of Equinor's severance tax refund for tax year 2015.[17]

---

[16]  We also acknowledge the Tax Commissioner's assertion that Equinor raises this argument for the first time on appeal.  However, in Equinor's April 2020 petition to the OTA, Equinor stated that, "[t]his Petition for Appeal is timely filed within 60 days pursuant to W. Va. Code, § 11-10A-9, as the actual amount in dispute was processed and approved on February 27, 2020."

[17]  The OTA stated that "the issue in this matter was whether the Tax Commissioner should be equitably estopped from moving for dismissal, after [Equinor] clearly missed the sixty (60) day statutory deadline in which to file an appeal with" the OTA.  Upon our de novo review, we conclude that the OTA's statement—that Equinor "clearly missed" the statutory deadline in which to file its appeal regarding the tax year 2015 refund—is erroneous because the $23,671.54 refund check satisfies the requirements

31

Subsection (a) of § 11-10A-9 buttresses Equinor's position that the February 27, 2020, check is a "written notice" for purposes of § 11-10A-9(b). Under subsection (a), a person starts a proceeding before the OTA by "timely filing a written petition that succinctly states: (1) The nature of the case; (2) The facts on which the appeal is based; and (3) Each question presented for review by the Office of Tax Appeals." *See also* W. Va. R. Code § 121-1-21.3.g (eff. April 20, 2003, to July 20, 2023) (petition "shall include . . . the amount of tax, additions, penalty, interest, or other amount in controversy," as well as the "specific relief sought by the petitioner"). Here, we agree with the Tax Commissioner that it issued a written notice to Equinor on February 27, 2019, as to the Tax Commissioner's decision regarding its refund of severance taxes for tax year 2015. We also agree with Equinor that the Tax Commissioner issued written notice to it on February 27, 2020, of yet another decision by the Tax Commissioner regarding Equinor's refund of severance taxes for tax year 2015—a decision that changed "[t]he facts on which [Equinor's] appeal" was "based." W. Va. Code § 11-10A-9(b). Thus, while the 2019 written notices (i.e., the decrease letters and the first refund check) each began a sixty-day filing clock pursuant to § 11-10A-9(b), the Tax Commissioner has not sufficiently explained why the subsequent written notice issued by him to Equinor (the $23,671.54 refund check of February 2020) would not begin a new, sixty-day filing clock under that

_____

of § 11-10-9(b) and thus is a "written notice of an assessment, denial of a refund or credit, order or other decision of the Tax Commissioner" that started Equinor's sixty-day clock to appeal the Tax Commissioner's decision to the OTA. *See Cahill v. Mercer Cnty. Bd. Educ.*, 208 W. Va. 180, 539 S.E.2d 440 (2000) ("Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.").

32

statute when it was a "a written notice of an . . . other decision by the Tax Commissioner" that changed a key fact stated in the February 27, 2019, decrease letter and refund check—the amount of Equinor's severance tax refund for tax year 2015.[18]  For those reasons, we conclude that the ICA erroneously reversed the decision of the OTA in which it denied the Tax Commissioner's motion to dismiss Equinor's petition for reassessment regarding tax year 2015.

## IV. CONCLUSION

For the reasons stated above, the November 15, 2023, decision of the ICA is affirmed, in part, and reversed, in part.  The portion of the ICA's decision at issue in appeal no. 24-26 is affirmed.  The portion of ICA's decision at issue in appeal no. 23-760 is reversed.  These matters are remanded to the OTA for entry of orders directing the Tax Commissioner to refund Equinor the amounts determined in accordance with this Opinion.

Appeal no. 24-26 is affirmed and remanded with directions.

Appeal no. 23-760 is reversed and remanded with directions.

---

[18] Equinor does not argue that the $23,000 refund check was insufficient for due process purposes.  The Tax Commissioner, however, does.  Considering the particular facts before us—including Equinor's obvious knowledge of the Tax Commissioner's reasons for reducing Equinor's severance tax refund for tax year 2015 and its right of appeal to the OTA—we decline to consider the argument.